IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. |
| | ) | 12-00280-01-CR-W-DW |
| ACIE EVANS, | ) | |
| | ) | |
| Defendant. | ) | |

### REPORT AND RECOMMENDATION TO DENY DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

Before the court is defendant's motion to suppress evidence seized from his automobile on September 4, 2012, and his statement on the ground that the search of his car was done with an investigative motive rather than as a lawful inventory search, and his subsequent confession was tainted by the unconstitutional search. I find that the search of defendant's vehicle was a lawful inventory search. Therefore, defendant's motion to suppress should be denied.

### I. BACKGROUND

On September 4, 2012, police had responded to a rape and, while investigating the scene, found an identification card in the name of Acie Evans and bearing his picture. Police saw defendant drive by the scene a couple of times. He drove unusually slowly and he spent a long time at a nearby stop sign observing the crime scene. The license plate on the car was registered to a man with the same last name. Because defendant appeared to be the man on the ID and was in a car registered to an Evans, police followed him into a nearby apartment complex. Defendant told police he lived at the complex and that his girl friend had gotten the apartment for him because of his criminal history. Once the apartment manager learned this, and when news crews began swarming the area, she told police she wanted defendant and his car off the property and said she intended to "evict" defendant's girl friend due to her

obtaining the apartment for someone else.  Defendant was arrested for driving without a license, and his car was towed.  Prior to towing, an inventory search was done and a loaded firearm was found in the car.  Later, defendant admitted to possessing the firearm for protection.

On September 26, 2012, an indictment was returned charging defendant with one count of possessing a firearm after having been convicted of a felony, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e).  On October 24, 2012, defendant filed the instant motion to suppress (document number 21).  On November 5, 2012, the government filed a response (document number 26) arguing that the search of defendant's vehicle was a lawful inventory search.

On November 6 and November 30, 2012, I held a hearing on defendant's motion.  The government appeared by Assistant United States Attorney Mike Green.  The defendant was present, represented by Assistant Federal Public Defender Anita Burns.  The following witnesses testified:

    1.    Officer Lorenzo Simmons, Kansas City, Missouri, Police Department

    2.    Office Willie Watson, Kansas City, Missouri, Police Department

    3.    Tiffany Chrisman, manager at Ruskin Place Apartments

    4.    Eljay Williams, maintenance technician at Ruskin Place Apartments

In addition, the following exhibits were admitted:

    P. Ex. 1    Kansas City, Missouri, Police Department tow policy

    P. Ex. 2    Inventory report

    P. Ex. 4    DVD of defendant's statement

    D. Ex. 1    Incident Report prepared by apartment manager Tiffany Chrisman

    D. Ex. 2    Transcript of interview between Special Agents Farris and Lester and apartment manager Tiffany Chrisman

2

Case 4:12-cr-00280-DW   Document 43   Filed 12/17/12   Page 2 of 18

## II. EVIDENCE

On the basis of the evidence presented at the suppression hearing, I submit the following findings of fact:

1. At approximately 7:30 in the morning on September 4, 2012, Officer Lorenzo Simmons, Officer Willie Watson and others responded to a call of a rape in progress at 11320 Bennington, a house in Kansas City, Missouri (1Tr. at 4-5, 7; 2Tr. at 4-5). Officers Simmons and Watson were standing guard out on the front yard while other officers and detectives went into the residence and began an investigation (1Tr. at 6-7; 2Tr. at 5). Officer Simmons was in the grass on the front yard and Officer Watson was on the street in front of the residence (1Tr. at 6-7; 2Tr. at 6). Officer Watson observed a tan four-door car leave the Ruskin Place Apartments down the street and stop at a stop sign about a half a block south from where he was standing (2Tr. at 6-7). The car stopped for 30 to 45 seconds, even though no traffic was coming from either direction (2Tr. at 6). Officer Watson found that to be unusual behavior, in his experience, and he mentioned it to Officer Simmons and Sergeant Rufus Evans (1Tr. at 7; 2Tr. at 6). Officer Watson believe the car should be stopped due to the driver's unusual behavior (2Tr. at 7).

2. One of the crime scene personnel found a Missouri identification card on the ground by a window of the residence that had been broken (2Tr. at 7-8). The name on the card was Acie Evans and there was a photograph of an African-American male (1Tr. at 8; 2Tr. at 8). Officer Watson saw the identification card and looked at the picture for some 30 to 45 seconds (2Tr. at 19).

3. The same tan four-door vehicle, an Infiniti, that had stopped for a long time at the stop sign ten to 15 minutes earlier then drove by the residence traveling at less than five miles per hour (2Tr. at 8). Officer Watson saw the driver and determined that he was the man

whose picture was on the identification card that had been found at the scene of the rape (2Tr. at 8-9). The car had no front license plate, but Officer Watson memorized the rear license plate number and asked Officer Simmons to run the plate through their computer system in the car (2Tr. at 9). The plate was registered to Bobby Evans (2Tr. at 9). Officer Watson watched the car go south on Bennington for about a half a block and then turn back into the Ruskin Place Apartment (2Tr. at 9-10). Because the car was registered to someone with the same last name as the name on the identification card at the rape scene and because the driver of the car matched the photo on the identification card, law enforcement officers followed it into the apartment complex, the entrance of which was about 1,000 feet away from the house on Bennington where the rape occurred (1Tr. at 10).

4. Officer Watson, Officer Simmons, Sergeant Evans and Major Oakman went to the Ruskin Place Apartments where the car had gone (2Tr. at 10). They saw that the tan Infiniti was parked in front of 11438 Blue Ridge, an apartment building (2Tr. at 10). Common sense told Officer Watson that if the car was parked in front of an apartment building, the driver probably went into that building (2Tr. at 10). While Officer Watson parked his patrol car next to the Infiniti, Officer Simmons went to the apartment office, which was about 1,000 feet beyond the building at 11438 Blue Ridge (1Tr. at 11, 18, 28; 2Tr. at 10-11, 25).

5. Officer Simmons contacted the apartment manager, Tiffany Chrisman; told her that an incident had occurred around the corner; and asked her if she had any person in the building at 11438 Blue Ridge named Evans (1Tr. at 12, 21-22; 2Tr. at 30-31). Ms. Chrisman looked through her computer system and said, "no," but then she looked through some files and noticed that one resident in the building, Amber Kelly, had listed an Acie Evans as an emergency contact (1Tr. at 12, 20-21). Ms. Kelly lived in apartment number 69 (1Tr. at 12). Ms. Chrisman testified that she saw that a man named Acie Evans had come by to see

4

apartment 69 before the apartment was leased to its current resident and that he was listed as a contact person for the least (2Tr. at 31-32). This conversation with Ms. Chrisman took approximately seven minutes; Officer Simmons then headed to apartment 69 (1Tr. at 13).

      6.      Meanwhile, Office Watson walked into the four-unit apartment building (2Tr. at 11). The door to his right was closed (2Tr. at 11). The door to his left, apartment 69, was partially open, so he knocked on the door (2Tr. at 11). Officer Watson's supervisor, Sergeant Evans, was standing right behind him in the door to the building (2Tr. at 20, 27). Defendant answered the apartment door, and Officer Watson observed that he was a black male who looked like the man Officer Watson saw drive by in the Infiniti, and he matched the photo on the identification card that had been found at the rape scene (2Tr. at 11). Defendant said his name was Acie Evans, and Officer Watson asked defendant if he had any identification (2Tr. at 11, 12, 20). Defendant said, "Yes, it's in my room" (2Tr. at 11). Officer Watson said that for officer safety, defendant could not go into the room by himself -- that Officer Watson would have to go with him (2Tr. at 11). Officer Watson followed defendant to a bedroom where he obtained a Kansas identification card (2Tr. at 11). Defendant asked what the police were doing there; he said he had just driven past them when they were standing on the street (2Tr. at 26). No one besides defendant was in the apartment when police arrived (1Tr. at 32). No other conversation took place between defendant and Officer Watson at that time (2Tr. at 20).

      7.      Officer Watson conducted a computer check for warrants and learned that defendant's driver's license had been suspended[1] (2Tr. at 12). Officer Watson placed defendant under arrest for driving without a valid license (2Tr. at 12-13). Office Watson informed others on the scene, including Sergeant Evans and Sergeant Colon, the Sex Crimes

---

[1] It was determined that defendant had no outstanding warrants and both Kansas and Missouri were checked to determine whether he had a valid driver's license, and he did not (2Tr. at 28).

5

detective supervisor, that defendant had been arrested for driving without a valid license and asked what they wanted done with defendant's car (2Tr. at 13).

8. By that time Officer Simmons had arrived at apartment 69 and saw that defendant had been placed under arrest (1Tr. at 13). Outside the apartment sometime later were the apartment manager, Ms. Chrisman; a sheriff's deputy who had been at the complex to assist with an unrelated eviction; and news crews who were beginning to show up (1Tr. at 13, 33). This was approximately 20 to 30 minutes after officers had first arrived at the complex; and when there about 15 news crews present, Ms. Chrisman had headed out of her office and toward the news crews and group of police (2Tr. at 24-25). Officer Simmons saw her and walked up to her; she asked what was going on and said she wanted to get the news crews off the property, and he explained why the police were there and why defendant had been arrested (1Tr. at 13-14, 22-23; 2Tr. at 24-25, 35). When Ms. Chrisman asked about the news crews and said she wanted them off the property, Officer Simmons said he had no control over that (1Tr. at 23, 24, 25). Officer Simmons told Ms. Chrisman that police believed they had a suspect in custody for the nearby rape, that defendant said the mother of his child (Amber Kelly) had rented the apartment for him because he had a conviction for involuntary manslaughter, and that Ms. Kelly was in Kansas and did not even live at this apartment (1Tr. at 24, 32-33; 2Tr. at 35, 48; D. Ex. 2). Ms. Chrisman said she wanted defendant gone and she said she wanted his car gone too[2] (1Tr. at 14, 25; 2Tr. at 35). She also told Officer Simmons to tell defendant that she intended to send an eviction notice to Amber Kelly because she broke her lease (1Tr. at 17, 24). Officer Simmons did not ask Ms. Chrisman if she wanted the police

---

[2]Ms. Chrisman did not remember whether she was told defendant had a car on the property or whether she just said she wanted him and any vehicle off the property (2Tr. at 35-36). However, Officer Simmons testified that he mentioned that defendant said he lived there and had his car there (1Tr. at 27). There was no vehicle listed in the lease agreement information (2Tr. at 36).

6

to tow defendant's car, she was the one who said to him that she wanted the car gone (1Tr. at 25-26; 2Tr. at 48).

9. Officer Simmons approached the other officers and indicated that the property manager said defendant is not supposed to be in the apartment because he is not on the lease and that she wanted his vehicle gone (2Tr. at 13). Law enforcement decided to tow defendant's vehicle because defendant was under arrest, the car was registered to a Bobby Evans, defendant was not the registered owner and therefore could not sign a release not to tow the car, and Ms. Chrisman had told them to get the car off the complex property (1Tr. at 15; 2Tr. at 14). There was no one else present who could take custody of the car and they had no one to leave it with at the apartment complex (1Tr. at 15; 2Tr. at 14). Defendant was not asked whether there was anyone would could take possession of his car (2Tr. at 22). Defendant had already said his girl friend was going to come to the scene, she had said she would be there in five to ten minutes, it had already been longer than that, and the officers could not continue to wait at the scene for someone else to respond to take control of the car (2Tr. at 23).

10. Performing an inventory search of a vehicle that is to be towed is mandatory, and that was indeed done (1Tr. at 17; 2Tr. at 17). The Kansas City police department's tow policy provides officers with some discretion (1Tr. at 17).

11. At some point Officer Simmons had a general conversation with defendant and asked him who Bobby Evans was (1Tr. at 26). Defendant said Bobby Evans was a relative (1Tr. at 26). The car had not been reported stolen, so the officers believed that defendant had permission to have the car (1Tr. at 26; 2Tr. at 24).

12. During the inventory search, police found a loaded Jennings .380 caliber pistol in the center console (2Tr. at 17-18).

7

13. On the day of defendant's arrest, Ms. Chrisman was upset about the newscasters being present and she had difficulty getting them to leave (2Tr. at 46). That same day she prepared a General Liability Incident Report in connection with her responsibilities as apartment manager (D. Ex. 2). She described the incident as follows:

> At around 8 am, I, Tiffany Chrisman was driving down Blue Ridge Blvd. when I observed a helicopter hovering over the Church's Chicken on the corner across from Ruskin Apartments. I went pulled up [sic] and clocked in to begin my work day. Around 9 am, Officer Simmons came into my office and asked if I had an Evans living her[e] on property. I told him that the name did not seem familiar, then I performed a search using my Onesite system to find Evans. No names were the Officers suspect. Officer Simmons then gave me and [sic] address of 11438 Blue Ridge Blvd. I had planned to go through the folders of each person residing in the 11438 building starting with apartment 69 and ending with apartment 71. I opened the file of #69 first and saw that on the application, the resident, Amber Kelly, had listed an emergency contact of Acie Evans. The Officer asked for a copy of the document and headed out the door. At around 10:00 am, Cheryl Holder had come into the office to report to work. One of her first phone calls was from a resident named Kevin Williams who informed Cheryl that police and newscasters were on property. I headed out the door to inform the newscasters that they were not to be on private property. I walked out of the door and down the sidewalk to the front parking lot of the clubhouse. I observed news stations of Channel 4, 9, and 5 in the parking lot immediately to my right (west end). As I walked up to Channel 9 camera men, I was met by Officer Simmons who informed me that they believed they had their guy. I was told that Acie was suspected of a home invasion where a woman was assaulted, raped, and then robbed of her vehicle. Officer Evans informed me that Acie Evans was living in our apartment unauthorized and had been told by Acie that his "baby's momma", Amber Kelly was actually living in Kansas and had just rented the apartment for him due to him being a convicted felon of involuntary manslaughter. I asked Officer Simmons to assist me in moving newscasters from my property. At that time, Officer Simmons told me that I could not ask them to leave until police were done. I went back to my office and called my DM, Susie Page. I asked Susie if this was correct and gave her the details of the events taking place. Susie let me know that she did not believe that was accurate due to Ruskin being private property. She instructed me to contact the lease holder, Amber Kelly, and let her know that she needed to surrender the apartment but keep details to a minimum. I then go off of the phone with Susie and instructed Cheryl to call the police department to verify that we could not request newscasters to leave our property. I called Amber Kelly, who did not answer, and I left a message for her to call me ASAP. Cheryl was told by the police headquarters that it was up to the responding Officers as to if we would be allowed to remove newscasters or not. He told her that he would call the responding Officer and see what he could do, then call me back on my cell phone. Susie then called back and let me know that she had spoken with our Vice President, Carol Smith and instructed me per Carol to go back outside and ask the newscasters to leave. I gathered all staff to go outside to remove newscasters and calm our residents down. By the time Cheryl, ElJay Williams, Micheal Smith, and I had gone

8

> out to the parking lot, Jonathan Tyrrell had already kicked all of the newscasters off property outside of Channel 5. I went over to Channel 5 and informed them that they were upsetting our residents and that they needed to leave property. They got out of the car and proceeded to walk to where a vehicle was being towed by police to film the incident. I followed behind them and repeated that they needed to leave now. They complied. I saw one of our residents, Willa Williams outside. I walked over to her and calmed her down by letting her know that the assault had not occurred on property and that the man arrested was not a resident of ours. This seemed to give her reassurance.

(D. Ex. 1).

14. Ms. Chrisman did not mention asking that defendant "and his vehicle" be removed from the property when she completed the incident report in her job as apartment manager (D. Ex. 1). When she prepared this report, Ms. Chrisman's focus was on the fact that Amber Kelly had rented the apartment not for herself, but for someone else who had been suspected of crimes, and that as a result news crews were present and she was trying to get them to leave the premises (2Tr. at 50). She intended this report to be used in her efforts to have Ms. Kelly relinquish the apartment since she did not actually live there (2Tr. at 52-53). In fact an eviction notice was drafted up on September 4, 2012, the day of this incident (2Tr. at 53).

15. When she was interviewed by defense counsel about six weeks later, Ms. Chrisman was asked whether she had requested that the police officers remove a vehicle from the property, and she said, "no" (2Tr. at 38). Ms. Chrisman thought at the time that the attorney and investigator were asking her "just generally" about whether or not defendant drove a car (2Tr. at 49). A couple weeks later, she was interviewed by Task Force Officer Owen Farris and Special Agent Steve Lester (2Tr. at 38; D. Ex. 2). That interview was recorded (2Tr. at 38-39). They asked if she had said she wanted the car off the property (2Tr. at 39). She said that she did not remember talking about a car but "that's what the lawyer kept asking me about" and it was possible that she had made that request (2Tr. at 39). She said the agents' questioning jogged her memory about the car, because when they brought up the type of car --

9

Infiniti -- she remembered that she had learned on September 4 that defendant had been driving an Infiniti and that she told Officer Simmons she wanted defendant and his vehicle taken off the property (2Tr. at 40, 49).

16. When Task Force Officer Farris was reviewing Officer Simmons's report with Ms. Chrisman, the following took place:

TFO FARRIS: "And the witness stated that she wanted the Infiniti off the property. The witness stated that she was going to send the renter, Amber Kelly, a vacate notice."

MS. CHRISMAN: Okay.

TFO FARRIS: I don't know if that's --

MS. CHRISMAN: Here's where -- okay. So now maybe it's the question of the car.

TFO FARRIS: Yes.

MS. CHRISMAN: I don't remember talking about the car but that's what that lawyer kept asking me about and it's possible I did. I know I said I'd like him off the property trespassed [sic]. I think I may have probably did say get the car off the property.

TFO FARRIS: Okay.

MS. CHRISMAN: Because, yeah, I just kind of wanted him and everything about him off of the property because we were having newscasters and all this mess.

TFO FARRIS: Uh-huh.

MS. CHRISMAN: Okay.

TFO FARRIS: Well, the question is it's on private property. The police wouldn't normally tow it because it's parked legally, blah, blah, blah, blah, blah. If it's on private property, it would take someone like you to say I want it off the property. Then the officers, what they did what they did, searched the car, called the tow truck and had it removed.

MS. CHRISMAN: Okay.

TFO FARRIS: So, it's -- I don't know what the other person's talking to you about but I mean, this is a -- it's a federal -- it's going to -- it's in federal court because --

MS. CHRISMAN: I'm pretty sure I did. I mean, at the time that that lawyer was in here talking to me, I couldn't remember talking about the car, but now that you've brought it up, because he didn't bring up anything about an Infiniti. I'm pretty sure I did ask them to get him, the car, everything off the property.

10

TFO FARRIS: Yeah, it was a white Infiniti and here's the license plate, if that helps you, or whatever.

MS. CHRISMAN: Uh-huh.

TFO FARRIS: But --

MS. CHRISMAN: Yes.

TFO FARRIS: I mean, and it could have been in conversation, what do you want to do with the car, I don't know how the officer talked to you about it.

MS. CHRISMAN: Yeah, I did. I can remember something about an Infiniti, so I'm sure that I did.

TFO FARRIS: Okay. Well, what we're going to do with this -- and that's -- I mean, it's very important because the officers wouldn't have been -- normally been in the car.

MS. CHRISMAN: Right.

TFO FARRIS: They wouldn't have found -- I don't know if they told you what was in the vehicle.

MS. CHRISMAN: No, they did not.

TFO FARRIS: That it was a firearm. Acie's not supposed to have a firearm and that's why we're -- he's [referring to Special Agent Lester] an agent with ATF.

MS. CHRISMAN: Okay.

TFO FARRIS: And I'm a Task Force Officer with him, a detective with the police department. And we do gun crimes and this kind of thing. So, it's a serious charge because Acie is not supposed [to] handle firearms.

MS. CHRISMAN: Right.

TFO FARRIS: And we've talked to him about that, and that's down the road, but this -- what's coming up next week is a suppression hearing, which you've been -- I don't know if you have been subpoenaed for it.

MS. CHRISMAN: I just got subpoenaed yesterday. The lawyer brought me the subpoena.

TFO FARRIS: Okay. Well, then that's what it's about. They're going to, you know, you're going to raise your right hand, sit on the stand.

MS. CHRISMAN: Okay.

TFO FARRIS: They're going to question you about what we're talking about and all you -- I mean, tell the truth, and what you remember, what -- you know, what happened. And then the -- the federal prosecutor will; again, you know, question you and talk to you about the same thing that we're doing today.

MS. CHRISMAN: It sounds scary.

TFO FARRIS: But I'm going to write a report.

SA LESTER: No, it's not. It's not going to be hostile.

TFO FARRIS: No.

MS. CHRISMAN: Okay.

SA LESTER: It's not going to be -- obviously, there's -- you know, your memory is refreshed now. You've got a little bit of an idea what's going on.

MS. CHRISMAN: Right.

SA LESTER: It's not like somebody's just, you know, the defense attorney just drops in and says here you go, what happened. And obviously they're trying to get their defense and so. Are they going to do any type of witness prep with her?

TFO FARRIS: I will -- well, I will call --

SA LESTER: The attorney.

TFO FARRIS: Yeah, I'll call the prosecutor and just ask him.

MS. CHRISMAN: I did my own incident report. I'm going to go grab that, if you guys don't care.

TFO FARRIS: Sure.

SA LESTER: Sure.

MS. CHRISMAN: I feel like maybe I'm missing something.

TFO FARRIS: Okay.

SA LESTER: Do you need to get a copy of the lease or anything while we're out here?

MS. CHRISMAN: I'll grab the whole file, okay?

TFO FARRIS: Okay. Yeah, we can.

Case 4:12-cr-00280-DW   Document 43   Filed 12/17/12   Page 12 of 18

SA LESTER: Because it -- that may -- that may help put her at ease a little bit because they're basically going to make her try to look like a liar, or that we coerced her to say --

TFO FARRIS: Yeah.

SA LESTER: -- X, Y and Z. So, it is what it is, though.

\* \* \* \* \*

MS. CHRISMAN: I'm so detailed, I get on my own nerves. Now I'm going to have to read through this whole stupid thing.

TFO FARRIS: Oh, take your time. You're fine.

MS. CHRISMAN: Okay. So, all I've got in here is that the vehicle was being towed and that they were going towards it -- the newscasters were. Okay. So, I didn't --

TFO FARRIS: Put anything in yours.

MS. CHRISMAN: -- put that in there, but I can remember talking about it.

TFO FARRIS: Okay. And then, I mean, you know, this -- I'll end up making a copy of this recording and they'll have it and our prosecutors will have it and so they'll ask you questions, well, one day you say it didn't happen and the other day --

MS. CHRISMAN: Right.

TFO FARRIS: Is there anything specific about when you went down there? I mean, can you see it in your memory, talking to the officer? I mean, is there something --

MS. CHRISMAN: Yes, because we went down there to actually kick the newscasters off, so he started walking -- the officer walked up to me and I was, like, hey, do they -- can I kick them off? Can they -- do they have to be here?

TFO FARRIS: Being the newscasters?

MS. CHRISMAN: Right.

TFO FARRIS: Uh-huh.

MS. CHRISMAN: And he says, no, we want them here right now. And I was real agitated, I can remember, because my boss was pressuring me, get them out of here, get them out of here. So, he said -- he told me, well, the -- his baby's momma got the apartment for him. And he's already admitted that, but he would have never got approved here anyway because he was convicted of manslaughter or something like that.

TFO FARRIS: And how did you know that?

13

MS. CHRISMAN: The officer actually had mentioned it whenever I was standing there with him.

TFO FARRIS: Okay.

MS. CHRISMAN: So, I walked back up here and that's when I got on the phone with my boss and then we called the police headquarters and we're just trying to gt the newscasters off.

TFO FARRIS: Okay.

MS. CHRISMAN: And that's the main thing I remember about.

TFO FARRIS: And then specifically about -- I mean, so you were down there and is that when you talked to him about the car or did you go back down there or?

MS. CHRISMAN: No, when I would have talked to him about the car would have been when he came up here.

TFO FARRIS: Okay.

MS. CHRISMAN: And then that's whenever I was like asking him, hey, if you guys find him, make sure that he -- give him a trespassing so he can't be on the property and he asked what I wanted to do about his vehicle and I'm like I want his vehicle gone and I want him gone.

TFO FARRIS: Okay.

MS. CHRISMAN: So, --

TFO FARRIS: Is it -- and you just --

MS. CHRISMAN: -- but I never knew what kind of vehicle he drove at that time until the officer had said what he had the Infiniti.

TFO FARRIS: Right.

MS. CHRISMAN: So.

TFO FARRIS: Okay. And then just the other day, whenever they, whoever came in and talked to you was not something that --

MS. CHRISMAN: Yeah, well, he kept saying -- he kept asking me like do I know anything about a car, what kind of car he drove, and it wasn't clicking to me because the other officer had asked me first and I was like, no.

TFO FARRIS: Right.

MS. CHRISMAN: So, I was just like, no, I don't know what kind of car he drives.

14

TFO FARRIS: Okay. But I mean the defense or whoever brought you a subpoena that -- did they -- that's what you're talking about.

MS. CHRISMAN: Yeah.

TFO FARRIS: That you just didn't remember then.

MS. CHRISMAN: Right.

TFO FARRIS: Okay.

MS. CHRISMAN: He's going to be mad when I show up.

TFO FARRIS: Well, it is what it is. I mean, that's -- happened back in September.

MS. CHRISMAN: Right.

TFO FARRIS: So, I mean, if it's not something you deal with every day, it's not in your memory or you're busy or whatever, so, that's -- that's -- and we just came in here to ask you the questions. We didn't threaten you or make any promises or tell you anything --

MS. CHRISMAN: Right.

TFO FARRIS: -- unusual about this. We just questioned you and you remembered on your own.

MS. CHRISMAN: Right.

(D. Ex. 2, p. 3-12).

### III.   *INVENTORY SEARCH*

Defendant argues that the search of his car was unlawful because it was conducted "as a result of the investigative motive on the part of the Officers to search for incriminating evidence".

The Supreme Court has recognized an exception to the warrant requirement for searching a vehicle lawfully impounded by law enforcement officers. Cady v. Dombrowski, 413 U.S. 433, 446-448 (1973). "Impoundment of a vehicle for the safety of the property and the public is a valid 'community caretaking' function of the police," which does not require a warrant. United States v. Petty, 367 F.3d 1009, 1011-1012 (8th Cir. 2004) (quoting Cady v.

15

Dombrowski, 413 U.S. at 441).

The impounding of a vehicle passes constitutional muster so long as the decision to impound is guided by a standard policy -- even a policy that provides officers with discretion as to the proper course of action to take -- and the decision is made "on the basis of something other than suspicion of evidence of criminal activity." Colorado v. Bertine, 479 U.S. 367, 375 (1987). These parameters are designed "to ensure that impoundments and inventory searches are not merely a ruse for general rummaging in order to discovery incriminating evidence." United States v. Petty, 367 F.3d at 1012 (internal quotation omitted).

Law enforcement may search a lawfully impounded vehicle to inventory its contents without obtaining a warrant. See South Dakota v. Opperman, 428 U.S. 364, 376 (1976); United States v. Pappas, 452 F.3d 767, 771 (8th Cir. 2006) ("An inventory search by police prior to the impoundment of a vehicle is generally a constitutionally reasonable search."). The reasonableness of an inventory search is determined based upon the totality of the circumstances. United States v. Beal, 430 F.3d 950, 954 (8th Cir. 2005). Those circumstances include whether the search was conducted according to standardized procedures. South Dakota v. Opperman, 428 U.S. at 376.

The Kansas City, Missouri, Police Department's tow policy provides that "in the officer's discretion, vehicles may be towed when:"

> 6. Any vehicle is parked on private property or upon an area developed as an off-street parking facility without the consent of the owner, lessee or person in charge of any such property or facility, and upon complaint to the police department by the owner, lessee or person in charge of such property or facility, and a summons has been presented to the owner or operator or affixed to the vehicle.

In this case, the vehicle was parked on private property; the person in charge of the property had complained to the police department and had requested that the car be removed from the property; and, although a summons had not been presented to the operator of the

16

vehicle, he had been placed under arrest for driving without a valid license. The uncontradicted evidence establishes that defendant was an unauthorized resident of the apartment complex, police had already waited for defendant's girl friend to show up, they had waited longer than they had been told it would take for her to arrive, and they had work to do and could not continue to wait at the site of the car for someone else to be contacted and to show up. Defendant was not the registered owner of the car, so he could not sign a waiver. News crews were swarming the apartment complex upsetting the residents, and the apartment manager indicated she wanted defendant and his car removed from the property so that she could regain control of the premises and get rid of the news crews.

Although the apartment manager admitted that when questioned by defense counsel she said she had not asked that the car be removed from the area, she explained that her main concern was to get rid of the news crews and begin the process of having Ms. Kelly relinquish the apartment. It was not until later, when officers mentioned defendant's Infiniti, that Ms. Chrisman remembered having learned about that car on the day of the incident and telling Officer Simmons that she wanted defendant and his car removed from the property.

"So long as the officer's residual judgment is exercised based on legitimate concerns related to the purposes of an impoundment, his decision to impound a particular vehicle does not run afoul of the Constitution." United States v. Petty, 367 F.3d 1109, 1012 (8th Cir. 2004). Police did not ask Ms. Chrisman to request that the car be removed. There is no evidence that they expected to find a gun in defendant's car, or that they had any suspicion that defendant would have evidence of a crime in his car. He was indeed suspected in the rape that had occurred; however, defendant had been taken into custody for driving without a license, and there is no evidence that searching his car did or would have furthered their investigation of the rape.

17

Because the police's decision to tow defendant's car was legally based on the department's tow policy, the inventory search prior to towing was constitutional and defendant's motion to suppress the firearm found during the search and defendant's subsequent statement should be denied.

## IV.   CONCLUSION

Based on the above-stated findings of fact and the law as discussed in section III, I conclude that defendant's car was lawfully searched pursuant to the inventory exception to the warrant requirement.  Therefore, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order denying defendant's motion to suppress evidence and his statement.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has 14 days from the date of this report and recommendation to file and serve specific objections.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
December 17, 2012